SIMONE B. GUILLORY, ET AL.

VERSUS

SAMUEL S. BROUSSARD, JR., ET AL.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 120947
HONORABLE PAUL J. deMAHY, DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, and Jimmie C. Peters, and John E. Conery, Judges.

AFFIRMED.

Conery, J., dissents and assigns reasons.

Philip A. Franco
Lauren Lopresto Tafaro
Diana Cole Surprenant
Adams and Reese LLP
701 Poydras Street, Suite 4500
New Orleans, LA 70139
(504) 581-3234
COUNSEL FOR PLAINTIFF/APPELLANT:
    Simone B. Guillory

**Donald W. Washington**
**Jones Walker LLP**
**P. O. Box 3408**
**Lafayette, LA 70502**
**(337) 593-7600**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
  **Samuel S. Broussard, Jr.**
  **Michelle B. Cart**
  **Kurt Van Brocklin, as Trustee of the SSB 2012 Family Trust No. 1**
  **Sam Broussard Trucking Co., Inc.**

**Justin J. Marocco**
**Jones Walker LLP**
**8555 United Plaza Blvd., 5th Floor**
**Baton Rouge, LA 70809-7000**
**(225) 248-2415**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
  **Samuel S. Broussard, Jr.**
  **Michelle B. Cart**
  **Kurt Van Brocklin, as Trustee of the SSB 2012 Family Trust No. 1**
  **Sam Broussard Trucking Co., Inc.**

**PETERS, J.**

Simone B. Guillory and Lamar B. Lopresto brought a shareholders' derivative action on behalf of Sam Broussard Trucking Company, Inc. against Samuel S. Broussard, Jr., the corporation's president and majority shareholder. Simone Guillory now appeals the trial court's grant of motions for involuntary dismissal which had the effect of dismissing all of the claims raised on behalf of the corporation. For the following reasons, we affirm the trial court's judgment in all respects.

## DISCUSSION OF THE RECORD

Samuel Broussard Trucking Company, Inc. ("SBT") is a family owned and operated business in New Iberia, Louisiana. Samuel Broussard, Jr. and his three sisters, Simone B. Guillory, Lamar B. Lopresto, and Michelle B. Cart are all shareholders in SBT. Ms. Guillory, Ms. Lopresto, and Ms. Cart each own ten percent of the corporate stock; and the remaining seventy percent is owned by Mr. Broussard and the SSB 2012 Family Trust No. 1 (Family Trust), a trust formed by Mr. Broussard. Mr. Broussard is the president of SBT, and both he and Ms. Cart serve on the corporation's board of directors.[1]

This particular litigation began on June 27, 2012, with Ms. Guillory and Ms. Lopresto filing a shareholders' derivative action on behalf of the corporation. Mr. Broussard, Ms. Cart, and the corporation were initially named as defendants.[2] Kurt Van Brocklin, as trustee of the Family Trust, was joined as a defendant by a

---

[1] Prior to the beginning of the disputes and disagreements giving rise to the filing of this suit, all three sisters served on the board of directors with their brother. However, at a September 1, 2011 shareholders' meeting, Mr. Broussard had Ms. Guillory and Ms. Lopresto removed as directors, and replaced them with his three daughters: Ashley, Danielle, and Victoria Broussard.

[2] The original petition asserts that Ms. Cart was joined as a defendant pursuant to La.Code Civ.P. art. 615 because she refused to join in the shareholders' derivative action; and that the corporation was being joined as a nominal defendant as required by La.Code Civ.P. art. 615.

subsequent pleading. In their initial petition, Ms. Guillory and Ms. Lopresto asserted claims of breach of fiduciary duty, self-dealing, and abuse of control by Mr. Broussard. Subsequent pleadings resulted in additional factual allegations supporting the claim of breach of fiduciary duty by Mr. Broussard.[3]

The issues went to trial beginning on October 20, 2014, with the issues before the trial court being narrowed down to three claims: one concerning excessive compensation paid to Mr. Broussard, one concerning his refusal to distribute profits, and one of unfair trade practices. After Ms. Guillory presented all of her evidence and rested her case, the defendants moved for involuntary dismissal of all of Ms. Guillory's claims. The trial court granted the defendants' motions and dismissed all claims asserted by Ms. Guillory. After the trial court executed a December 3, 2014 judgment corresponding to its trial court judgment, and after the trial court rejected her motion for new trial on March 30, 2015, Ms. Guillory perfected the appeal now before us.

In her appeal, Ms. Guillory asserts two assignments of error:

1. The trial court committed a reversible error of law in granting involuntary dismissal by shifting the burden of proof to the plaintiff shareholder in a derivative action when it is the defendant's [sic] burden to prove the compensation he intentionally set himself was in good faith, inherently fair to the corporation, and was essentially an arm's length transaction.

2. The trial court committed a reversible error of law in granting involuntary dismissal of Ms. Guillory's claim that the intentional refusal of Mr. Broussard, Jr. to distribute profits of a corporation to its shareholders to coerce dismissal of shareholder lawsuits against him constitutes an unfair and deceptive trade practice under the Louisiana Unfair Trade Practices Act (["]LUPTA").

---

[3] On July 17, 2013, Ms. Lopresto filed a motion to be dismissed as a plaintiff in the suit, and the trial court granted the motion the same day. However, at the request of all parties, she rejoined the litigation by filing an intervention petition. The trial court granted her intervenor status by an order dated May 14, 2014.

## OPINION

### *Motion for New Trial*

Ms. Guillory's April 21, 2015 motion and order of appeal asserts that she appeals not only the trial court's judgment granting the motions for involuntary dismissal, but also the trial court's denial of her motion for new trial. With regard to the issue of motion for new trial, this court held in *Dietz v. Superior Oil Co.*, 13-657, pp. 3-4 (La.App. 3 Cir. 12/11/13), 129 So.3d 836, 839-40, that:

> A trial court's decision to deny a motion for new trial is an interlocutory judgment subject to appeal for abuse of discretion only upon a showing of irreparable harm. *Dural v. City of Morgan City*, 449 So.2d 1047 (La.App. 1 Cir.1984). However, "where a motion for appeal refers by date to the judgment denying a motion for new trial, but the circumstances indicate that the appellant actually intended to appeal from the final judgment on the merits, the appeal should be maintained as being taken from the judgment on the merits" *Id.* at 1048 (citing *Smith v. Hartford Accident and Indemnity Company*, 254 La. 341, 223 So.2d 826 1969); *Fruehauf Trailer Company v. Baillio*, 252 La. 181, 210 So.2d 312 (1968); *Kirkeby-Natus Corporation v. Campbell*, 250 La. 868, 199 So.2d 904 (1967)).

Although Ms. Guillory asserted in her motion for appeal that she was appealing the trial court's denial of her motion for new trial, she only briefed the issues pertaining to the trial court's grant of the involuntary dismissal. Because the circumstances before us clearly establish that Ms. Guillory intended to appeal only the final judgment on the merits, we need not address the motion for new trial issue.

### *Motions for Involuntary Dismissal*

The question of whether a proceeding may be the subject of a motion for involuntary dismissal is governed by the provisions of La.Code Civ.P. art. 1672(B), which states:

> In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the

3

ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.

This court set out the standard of review applicable to the grant of a motion for involuntary dismissal in *Touchet v. Hampton*, 06-1120, pp. 3-4 (La.App. 3 Cir. 2/7/07), 950 So.2d 895, 898, where we stated that:

> "The trial court is granted much discretion in determining whether to grant an involuntary dismissal." *Boone v. Reese*, 04-979, p. 5 (La.App. 3 Cir. 12/8/04), 889 So.2d 435, 438 (citing *Kite v. Carter*, 03-378 (La.App. 3 Cir. 10/1/03), 856 So.2d 1271). "The trial court's grant of an involuntary dismissal is proper if, after weighing and evaluating all of the evidence that has been presented by the plaintiff, the trial court determines that the plaintiff has failed to prove his claim by a preponderance of the evidence." *Id.* at 439. The granting of an involuntary dismissal is reviewed under the manifest error standard of review. *Id.*

With these legal considerations in mind, we turn to review each of the trial court rulings on the motions for involuntary dismissal.

*Excessive Compensation*

One of Ms. Guillory's primary complaints concerning Mr. Broussard's abuse of his position of control within the corporation involved the amount of compensation he received for the services he rendered to the corporation in his executive capacity. In most years, his total compensation exceeded $1,000,000.00 per year,[4] and Ms. Guillory asserted that the normal compensation for Mr. Broussard's position would be in the range of $250,000.00.

In her first assignment of error, Ms. Guillory asserts that Mr. Broussard set his own compensation, and that he had the burden at trial to establish that his

---

[4] Mr. Broussard testified at trial that he manages several separate companies under the SBT umbrella. To save on overhead and administrative costs, SBT manages all of the accounts for all of the companies under its umbrella. This means that SBT technically pays Mr. Broussard's salary for all of the companies it manages; however, SBT charges the portion of Mr. Broussard's salary attributable to each company back to it. Therefore, while SBT may cut the check for Mr. Broussard's salary, every company repays SBT the amount of his salary, plus a 14% processing fee.

compensation was set in good faith, was inherently fair to the corporation, and was set in an arm's length transaction. She asserts that the trial court improperly reversed that burden of proof by requiring her to show that it was excessive. In support of her position, she refers this court to the provisions of La.R.S. 12:84 (repealed 2015) as that statute read at the time issue was joined in this litigation:[5]

> A. No contract or transaction between a corporation and one or more of its directors or officers, or between a corporation and any other business, nonprofit or foreign corporation, partnership, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the common or interested director or officer was present at or participated in the meeting of the board or committee thereof which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if:
>
> (1) The material facts as to his interest and as to the contract or transaction were disclosed or known to the board of directors or the committee, and the board or committee in good faith authorized the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or
>
> (2) The material facts as to his interest and as to the contract or transaction were disclosed or known to the shareholders entitled to vote thereon, and the contract or transaction was approved in good faith by vote of the shareholders; or
>
> (3) The contract or transaction was fair as to the corporation as of the time it was authorized, approved or ratified by the board of directors, committee, or shareholders.
>
> B. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorized the contract or transaction.

---

[5] By 2014 La. Acts No. 328, § 1, the Louisiana Legislature enacted La.R.S. 12:1-101 to 12:1-1704 to comprise Chapter 1 of the Business Corporation Act of Title 12 of the Louisiana Revised Statutes. At the same time, by 2014 La. Acts No. 328, § 5, the Louisiana Legislature repealed former Chapter 1 of the Business Corporation Law, consisting of La.R.S. 12:1 to 12:178, as well as La.R.S. 12:1605 to 12:1607.

Ms. Guillory asserts that Mr. Broussard was an "interested director," as that term was used in La.R.S. 12:84,[6] because he contracted with himself when setting his compensation as president of SBT. She further argues that since Mr. Broussard had control over the majority of the board of directors, any approval that the board gave for his compensation was invalid; thus narrowing the issue to whether the compensation was fair to the corporation. According to Ms. Guillory, the issue of the fairness of the compensation is an affirmative defense which Mr. Broussard did not raise in his pleadings.

On the one hand, Ms. Guillory asserts that based on the mere filing of her pleading, the trial court should have presumed that Mr. Broussard's compensation was excessive, and that the burden was on him to prove that it was not excessive. On the other hand, Ms. Guillory actually presented expert testimony at trial in an attempt to establish that Mr. Broussard's compensation was excessive.

In support of her argument that the initial burden of proof should have been placed on Mr. Broussard rather than her, Ms. Guillory cites this court to a number of cases which she claims supports her position. In one of these cases, *Noe v. Roussel*, 310 So.2d 806, 818-19 (La.1975), the supreme court held that "an agent who acquires his principal's property, or one who otherwise acts in a fiduciary capacity, bears the burden of establishing that the transaction was an arm's length affair." Additionally, this court, in *Woodstock Enterprises, Inc. v. International Moorings & Marine, Inc.*, 524 So.2d 1313, 1317 (La.App. 3 Cir. 1988), held that "[a]n interested director bears the burden of proving his good faith in entering into a contract on behalf of his corporation as well as the inherent fairness of such contract from the standpoint of the corporation." In another case, *Donaldson v.*

---

[6] Unless stated to the contrary, all references to the Business Corporation Law in this opinion will refer to that version of the Business Corporation Law in effect at the time of the complained of actions.

*Universal Engineering of Maplewood, Inc.*, 606 So.2d 980, 988 (La.App. 3 Cir. 1992) (citations omitted), this court again held: "The person acting in the fiduciary capacity bears the burden of establishing that his transactions were legitimate. By law, the interested director must show not only that the action was fair to the corporation, but also that it was essentially an 'arms length' transaction." While we do not disagree with the rule of law asserted in these cases, we do not find that they support Ms. Guillory's argument because in each of the three cases, the plaintiffs presented evidence in support of their claims before the burden shifted to the defendants to defend their actions.

Mr. Broussard and the other defendants assert that only after Ms. Guillory established that Mr. Broussard's compensation was excessive would the burden shift to them to prove that the compensation had been set in good faith, was fair to the corporation, and was an arm's length transaction; and that she failed in that burden. Thus, they argue, they were entitled to the involuntary dismissal because she failed in that burden. In support of their position, they rely on La.R.S. 12:91 (repealed 2015), as that statute read at the time issue was joined in this litigation, which provided:

> A. Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment, and skill which ordinary prudent men would exercise under similar circumstances in like positions; however, a director or officer shall not be held personally liable to the corporation or the shareholders thereof for monetary damages unless the director or officer acted in a grossly negligent manner as defined in Subsection B of this Section, or engaged in conduct which demonstrates a greater disregard of the duty of care than gross negligence, including but not limited to intentional tortious conduct or intentional breach of his duty of loyalty. Nothing herein contained shall derogate from any indemnification authorized by R.S. 12:83.
>
> B. As used in this Section, "gross negligence" shall be defined as a reckless disregard of or a carelessness amounting to indifference to the best interests of the corporation or the shareholders thereof.

7

C. A director or officer who makes a business judgment in good faith fulfills the duty of diligence, care, judgment, and skill under Subsection A of this Section if the director or officer:

(1) Does not have a conflict of interest with respect to the subject of the business judgment.

(2) Is informed with respect to the subject of the business judgment to the extent the director or officer reasonably believes to be appropriate under the circumstances.

(3) Rationally believes that the business judgment is in the best interests of the corporation and its shareholders.

D. In fulfilling his duties under this Section, a director or officer is entitled to rely upon records and other materials and persons as specified in R.S. 12:92(E).

E. A person alleging a breach of the duty of diligence, care, judgment, and skill owed by an officer or director under Subsection A shall have the burden of proving the alleged breach of duty, including the inapplicability of the provisions as to the fulfillment of the duty under Subsections C and D and, in a damage action, the burden of proving that the breach was the legal cause of damage suffered by the corporation.

F. The provisions of this Section shall apply to all business organizations, whether incorporated or unincorporated, formed under Louisiana law.

Mr. Broussard and the other defendants cite several cases to this court which they suggest support their argument on the shifting burden of proof. In *Hirsch v. Cahn Electric Co., Inc.*, 29,327 (La.App. 2 Cir. 5/9/97), 694 So.2d 636, *writ denied*, 97-1561 (La. 10/3/97), 701 So.2d 200, the second circuit upheld the trial court's determination that the defendants received excessive compensation in that case. On the issue of excessive compensation, the second circuit found that the trial court "determined that the plaintiff's expert witness was more credible," which shows that the plaintiff in *Hirsch* presented evidence as to the excessiveness of the defendants' salaries. *Id.* at 643. In *Thornton ex rel. Laneco Construction Systems, Inc. v. Lanehart*, 97-2871 (La.App. 1 Cir. 12/28/98), 723 So.2d 1127, *writ denied*, 99-177 (La. 3/19/99), 740 So.2d 115, the first circuit upheld the

8

involuntary dismissal of the plaintiff's claims in a shareholder derivative action on the issue of payment of dividends. The plaintiff in *Thornton* presented the testimony of two certified public accountants ("CPA" or "CPAs") to support his claims, and the CPAs testified that they "compared Laneco to other industrial contractors with relatively similar sales volume, using information from a statistical compilation published by [a data compilation company]." *Id.* at 1133-34. According to the first circuit, "[b]oth CPA's [sic] concluded from their analyses of these comparisons that Laneco was paying its officers and directors too much and distributing too little to shareholders as dividends." *Id.* at 1134. The trial court in *Thornton* questioned the data relied on by the CPAs and ultimately held that "there has been no evidence presented to convince me that the plaintiff will prevail on that issue. And I will grant the motion for involuntary dismissal with regard to the payment of dividends." *Id.*

With respect to the burden of proof in this case, this court finds our decision in *Duncan v. Moreno Energy, Inc.*, 13-668 (La.App. 3 Cir. 12/11/13), 129 So.3d 849, *writ denied*, 14-457 (La. 4/17/14), 138 So.3d 629, to be informative and helpful. In *Duncan*, the defendant moved for involuntary dismissal at the end of the plaintiff's case, and the trial court granted the motion. Similar to our present case, the plaintiff in *Duncan* asserted on appeal that the trial court erred in placing the burden of proof on him, and that the defendants should have had the burden of proving that they "acquired th[e] assets in good faith and that the transactions were entered into at arm's length." *Id.* at 858. On the issue of the burden of proof as to the alleged breach of fiduciary duty in that case, this court held:

> Certainly, La.R.S. 12:91(E) places the burden of proof in a breach of fiduciary duty claim on the person seeking to establish that claim. Additionally, however, La.R.S. 12:84 sets forth certain standards by which an interested director may enter into a transaction beneficial to himself or herself. In this regard, a panel of this court

9

has explained that "[a]n interested director bears the burden of proving his good faith in entering into the contract as well as the inherent fairness of the contract from the standpoint of the corporation. This requires the director to prove that the contract was essentially an arm's length transaction." *Church Point Wholesale Beverage Co., Inc. v. Voitier*, 97-650, p. 9 (La.App. 3 Cir. 1/14/98), 706 So.2d 1015, 1019-20 (citing *Noe [v. Roussell]*, 310 So.2d 806 [La.1975]; *Woodstock Enter., Inc. v. Inter. Moorings & Marine, Inc.*, 524 So.2d 1313 (La.App. 3 Cir.1988)), *writ denied*, 98-0379 (La.4/9/98), 717 So.2d 1145.

Recall that this case was dismissed at the close of Mr. Duncan's evidence. Even without the defendants' presentation of their own evidence, the trial court's ruling reflects its determinations that the transactions complained of by Mr. Duncan were justifiable and were not made with an intent to devalue Mr. Duncan's shareholder status in the company. As explained above, we find that the trial court's ruling in this regard is supported by the record.

*Id.* at 858-59 (first alteration in original) (footnote omitted).

We have neither been directed to, nor found, a case wherein a court held that the plaintiff satisfied their prima facie case by merely filing a pleading alleging a breach of the defendant's fiduciary duty to the corporation. For that reason, we do not find that Ms. Guillory's pleading alone is enough to shift the burden of proof to Mr. Broussard and the other defendants on this matter. We now turn to examine the evidence presented at trial by Ms. Guillory to determine if the trial court committed manifest error in granting the defendants' motions for involuntary dismissal.

At the hearing three witnesses testified: Mr. Broussard, Ronald Lewis Gagnet, and Michael Lopresto;[7] and forty-nine exhibits were entered into evidence. Ms. Guillory's primary argument on appeal is that Mr. Broussard admitted, during his trial testimony, that a normal salary for his position would be $250,000.00, but that he was actually being paid over four-times that amount.

We find this assertion to be a mischaracterization of Mr. Broussard's

---

[7] Mr. Lopresto did not testify as to the excessiveness or reasonableness of Mr. Broussard's salary.

10

testimony. Mr. Broussard repeatedly testified that the $250,000.00 figure was derived from a report compiled by the McClean Group, with his input, which was to be used as a tool to market SBT to prospective buyers.[8] According to Mr. Broussard, the $250,000.00 compensation figure was just a number that he and the McClean Group agreed to use, because they were "normalizing" SBT's expenditures. While on direct examination of Mr. Broussard, Ms. Guillory's trial counsel attempted to equate the term "normalizing" to what would be a "normal salary" for someone in Mr. Broussard's position. However, Mr. Broussard made it clear in his testimony that the term "normalizing" was used to indicate that SBT's expenditures were being reduced down to bare-bones operating costs. In the McClean Group report, not only were Mr. Broussard's and other corporate executives' salaries "normalized," but expenses related to things like the company picnic and Christmas party were as well; because although SBT paid these kinds of expenses, a future purchaser would not necessarily incur those expenses. Essentially, the purpose of normalizing SBT's expenses was to reduce the core expenses in order to show what it would cost to actually run the company.

Mr. Broussard explained that the $250,000.00 compensation figure was basically a place-holder number, one that would be used to market SBT to interested companies, and which could be adjusted up or down by an interested purchaser in calculating the worth of the company. We do not interpret Mr. Broussard's testimony to be that he felt $250,000.00 was appropriate compensation for the work that he was doing at SBT. Nor do we find merit in Ms. Guillory's argument that Mr. Broussard's use of the $250,000.00 salary figure in the marketing report was proof that any compensation he received above that amount

_____

[8] Much of the trial testimony on this issue was Ms. Guillory's counsel attempting to establish that Mr. Broussard, and not the McClean Group, choose the salary figure.

11

was excessive. We find that the choice of this number for use in the report by whomever is irrelevant to the issue of excessive compensation.

Ms. Guillory also relies on the testimony of Mr. Gagnet, a CPA with thirty years of experience, to establish that Mr. Broussard's compensation was excessive to such a degree that the burden of proof shifted to him to establish otherwise. Mr. Gagnet testified that he examined a U.S. Bureau of Labor Statistics report which found that the average yearly salary for Chief Executive Officers was $210,000.00. Based on that research, the McClean Group report, and his thirty years of experience in filing tax returns for businesses and individuals in Louisiana, Mr. Gagnet concluded that $250,000.00 would be reasonable compensation for Mr. Broussard. On cross-examination, Mr. Gagnet admitted that he did not independently verify all of the figures in the McClean Group report, and that he accepted the $250,000.00 figure as reasonable compensation because it was the number provided in the report. In fact, Mr. Gagnet's opinion concerning the excessiveness of Mr. Broussard's compensation was centered around the assumption that $250,000.00 was the reasonable compensation for the position, and that he received excessive compensation any year his compensation exceeded that amount.

In granting the defendants' motion for involuntary dismissal relating to the excessive compensation claim, the trial court stated:

> With regard to excessive compensation as I indicated earlier, there's no question but that Mr. Broussard intentionally set the amount of his compensation or had the amount of his compensation set and this was an intentional action. The question is whether plaintiff proved that the compensation was excessive.

> There's no argument, no evidence challenging the amount of his compensation that is established by the W-2 forms and the 1099's and other evidence indicating how those amounts were calculated and who paid those amounts. The question being was it excessive? And

12

that comes through the testimony of Mr. Gagnet. He without question testified that in his opinion it was excessive.

The question is what is the basis of his opinion? Simply because a person is qualified as an expert and sits on the witness stand and gives an opinion the Court is not required to accept that opinion unless there is a basis for that opinion.

After noting Mr. Gagnet's reliance on the U.S. Bureau of Labor Statistics report, his years of performing tax returns, and the McClean Group report, the trial court stated the following:

Those being the basis for Mr. Gagnet's expert opinion, I do not find Mr. Gagnet's expert opinion to be reliable. Therefore, find that the plaintiff has failed to prove that the compensation paid to Mr. Broussard is excessive. I'm not saying that -- it may well be excessive, but the plaintiff failed to prove it and therefore, I will grant the Motion for Involuntary Dismissal regarding the excessiveness of the compensation[.]

We find no manifest error in the trial court's factual conclusions in this regard and we find no error in its grant of the defendants' motion for involuntary dismissal on the issue of excessive compensation.

***Unfair Trade Practices Act and Distribution of Profits***

Ms. Guillory's second assignment of error asserts that the trial court erred when it failed to find that Mr. Broussard's attempt to coerce the shareholders into dropping their lawsuit by refusing to distribute SBT's profits constituted a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPA), La.R.S. 51:1401, *et seq.*

Ms. Guillory's argument on this issue is not that Mr. Broussard has committed "[u]nfair methods of competition[,]" but rather that he has committed "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" La.R.S. 51:1405. Ms. Guillory argues that "trade" or "commerce," as defined in La.R.S. 1402(10), includes the "distribution of any services and any property . . . or thing of value[,]" which, she argues, includes the distribution of a corporation's

13

profits. She further asserts that she has a private right of action against the defendants, per La.R.S. 51:1409(A), which states in pertinent part:

> Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages.

This assertion is supported by *Cheramie Services, Inc. v. Shell Deepwater Production, Inc.*, 09-1633, p. 6 (La. 4/23/10), 35 So.3d 1053, 1057, in which a plurality of the supreme court found that "LUTPA grants a right of action to any person, natural or juridical, who suffers an ascertainable loss as a result of another person's use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Mr. Broussard and the other defendants argue, on the other hand, that Ms. Guillory's interpretation of LUTPA would turn the statute into a general tort statute. They argue that LUTPA does not apply in a situation where a stockholder brings a "garden variety suit" against a corporation's manager, and cite this court to *Quality Environmental Processes, Inc. v. I.P. Petroleum Co., Inc.*, 13-1582, 13-1588, 13-1703 (La. 5/7/14), 144 So.3d 1011, to support their argument that LUTPA does not apply to situations like the present case. In that case, the supreme court held:

> In LUTPA, the legislature declared it to be unlawful to engage in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La.Rev.Stat. § 51: 1405. Because of the broad sweep of this language, "Louisiana courts determine what is a LUTPA violation on a case-by-case basis." Keith E. Andrews, Comment, *Louisiana Unfair Trade Practices Act: Broad Language and Generous Remedies Supplemented by a Confusing Body of Case Law*, 41 Loy. L.Rev. 759, 762 (1996) (hereinafter "Andrews"). This court has consistently held that in establishing a LUTPA claim, a plaintiff must show that "the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Cheramie*

14

*Services, Inc. v. Shell Deepwater Prod.*, 09-1633, p. 11 (La.4/23/10), 35 So.3d 1053, 1059. "[T]he range of prohibited practices under LUTPA is extremely narrow," as LUTPA prohibits only fraud, misrepresentation, and similar conduct, and not mere negligence. *Id.* at 11, 35 So.3d at 1059; Andrews, 41 Loy. L.Rev. at 763. Moreover, conduct that offends established public policy and is unethical is not necessarily a violation under LUTPA. *See, e.g., Cheramie Services*, 09-1633 at 12, 35 So.3d at 1060 ("[O]nly egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA."); *Vermilion Hosp., Inc. v. Patout*, 05-82, p. 6 (La.App. 3 Cir. 6/8/05), 906 So.2d 688, 693 (noting that not all violations of the Louisiana Code of Ethics give rise to a cause of action under LUTPA and that persons aggrieved by such violations of the code of ethics are permitted to file a complaint with the Louisiana Board of Ethics or seek remedies under other statutes).

Notably, LUTPA was modeled after the Federal Trade Commission Act (hereinafter "FTC Act"), and the two acts share the same goals: to protect consumers and to foster competition. *See* Andrews, 41 Loy. L.Rev. at 777. Specifically, these goals include halting unfair business practices and sanctioning the businesses which commit them, preserving and promoting effective and fair competition, and curbing business practices that lead to a monopoly and unfair restraint of trade within a certain industry. *See, e.g., Slough v. Fed. Trade Comm'n*, 396 F.2d 870 (5th Cir.1968), *cert. denied*, 393 U.S. 980, 89 S.Ct. 448, 21 L.Ed.2d 440 (1968) ("The aim of the [Act] is to stamp out unfair business practices and businesses which persist in practicing them."); *United States v. St. Regis Paper Co.*, 355 F.2d 688 (2d Cir.1966) (noting that the policy of the FTC Act is to promote and preserve competition); *Northam Warren Corp. v. Fed. Trade Comm'n*, 59 F.2d 196 (2d Cir.1932) ("[The purpose of the Act] is to strike down at their inception practices which are unfair and which, if permitted to run their full course, would result in the creation of a monopoly and an undue restraint of trade.").

*Id.* at 1025-26 (alteration in original).

Ms. Guillory presented no evidence at trial to establish that a failure to distribute profits in the form of shareholder dividends is an unfair or deceptive act committed in the conduct of any trade or commerce. On the motion for involuntary dismissal on the issue of distribution of profits, the trial court held that "although, the evidence does indicate that Mr. Broussard intentionally did not distribute the profits . . . there was a valid business reason for not distributing them. Therefore, he did not violate his fiduciary duty."

With regard to the LUTPA issue, the trial court referenced La.R.S. 51:1405(A), which holds that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful[,]" and then noted the definitions set forth in La.R.S. 51:1402(10):

> "Trade" or "commerce" means the advertising, offering for sale, sale, or distribution of any services and any property, corporeal or incorporeal, immovable or movable, and any other article, commodity, or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of the state.

The trial court then went on to state:

> Considering that definition of "trade and commerce" it is this Courts [sic] opinion that that does not include the distribution or failure to distribute profits by a corporation to its shareholders. Therefore, it's this Courts [sic] opinion that the unfair trade practices and unfair consumer protection law do not apply to this situation . . . and, therefore, I will grant the Motion for Involuntary Dismissal for any claims under the [Unfair Trade Practices and Consumer Protection Law].

Based on the lack of evidence presented at trial on this issue, we find no manifest error in the trial court's grant of the defendants' motion of involuntary dismissal.

## DISPOSITION

For the foregoing reasons, we affirm the decision of the trial court granting the motions for involuntary dismissal brought by Samuel Broussard, Jr., Michelle Cart, Kurt Van Brocklin, as Trustee of the SSB 2012 Family Trust No. 1, and Sam Broussard Trucking Co., Inc. on Simone Guillory's claims of breach of fiduciary duty due to excessive compensation and violation of the Louisiana Unfair Trade Practices Act for failure to distribute profits. We assess all costs of this appeal to Simone Guillory.

**AFFIRMED.**

16

SIMONE B. GUILLORY, ET AL.

V.

SAMUEL S. BROUSSARD, JR., ET AL.

**CONERY, J., dissents and assigns reasons.**

I respectfully dissent.

When family members fight over management of a closely held family corporation, nobody wins. Sam Broussard, Sr. started a trucking company known as Sam Broussard Trucking Company, Inc. (SBT). When he died, each of his four children inherited twenty-five percent of the stock in this closely held family corporation. Sam Broussard, Jr. became president and manager of SBT. Apparently, he successfully managed SBT and increased its earnings. Eventually, he felt that he was not being properly compensated for the amount of time and effort that he was putting into SBT. He proposed that his sisters sell him fifteen percent of their shares such that he would own a seventy percent interest in SBT. They agreed, but Mr. Broussard eventually had SBT purchase the shares as "treasury stock." In effect, instead of dividing the net profits or dividends on a twenty-five percent basis, Mr. Broussard had SBT use what could have been some potential dividends to have SBT buy his sisters' shares as treasury stock, thus increasing his interest to seventy percent of the outstanding shares. Mr. Broussard then began to increase his executive compensation, allegedly without notice to his sisters.

Beginning in 2004, after acquiring seventy percent of SBT's stock in 2003, which would have entitled him to receive seventy percent of SBT's net profits, Mr. Broussard unilaterally, and without his sisters' knowledge or agreement, began to substantially increase his executive compensation through increased salaries and bonuses.

In 2004, SBT paid Mr. Broussard approximately $450,000, which he increased to approximately $675,000 in 2005. In 2006, he paid himself in salaries and bonuses approximately $1.8 million and in 2007 and 2008 approximately $1.15 million. He paid himself $680,000 in 2009 and $1.1 million in 2010. In 2011, the year in which his sisters finally demanded to see SBT's financial records, Mr. Broussard paid himself in salary and bonuses approximately $1.5 million, plus a $210,000 distribution as a shareholder and a Director's fee of $6,000.

One of his sisters, Michelle Cart, worked with Mr. Broussard at SBT and at one point alerted her two siblings, Ms. Guillory and Ms. Lopresto, that perhaps they should look at the financial records of SBT. When they asked to do so, Mr. Broussard became very defensive and threatened to remove all of them from the SBT Board of Directors (Board) and threatened to terminate his sister, Ms. Cart. Allegedly, when he had initially proposed that he have seventy percent of the stock, he had promised that as a condition of the transfer of majority control to him, he would maintain each of them on the Board and continue paying "Director's fees." Moreover, they would maintain ownership of the real estate and improvements from which SBT operated and SBT would continue to pay them each twenty-five percent of the monthly rentals for SBT's use of the property and improvements. After Mr. Broussard threatened to remove his sisters from the Board, for the first time he took the position that SBT owned the real estate and

buildings and would no longer pay rent to his sisters.

After receiving the threatening e-mails, Ms. Cart withdrew her demand and agreed to remain employed at SBT. Mr. Broussard then sent her an e-mail congratulating her on her decision, allowed her to remain employed and on the Board, and told her he would "take care of her."

Ms. Guillory and Ms. Lopresto persisted in their demand to see the financial records of SBT, and an attorney demand letter was sent to Mr. Broussard by Ms. Lopresto's husband, attorney Michael Lopresto. Still Mr. Broussard resisted. Eventually, Mr. Broussard followed through on his threat to remove Ms. Guillory and Ms. Lopresto from the Board, reported Mr. Lopresto to the attorney ethics board, claiming that he had previously represented SBT and his representation of his wife and sister-in-law in a claim against SBT was a conflict of interest. Mr. Broussard then appointed his own children to the Board, voted their proxies, and continued running SBT as he saw fit. He refused to distribute dividends, even though SBT had large net profits, and he continued to refuse to allow access to SBT's financial records.

Ms. Guillory and Ms. Lopresto then filed a mandamus suit compelling Mr. Broussard to furnish the financial records of SBT, and when he finally did so, they allegedly discovered what they claimed to be excessive compensation and misuse of SBT's assets. There were allegations that Mr. Broussard built improvements on jointly owned inherited property and paid many of the expenses of his horse ranch with SBT funds. Those claims were apparently settled and are not at issue here.

The situation had been further exacerbated by Mr. Broussard, as after he had increased his stock ownership in SBT, Mr. Broussard elected to file tax returns as a Subchapter S Corporation, thus making the shareholders individually liable for

taxes based on their percent ownership of SBT's net profits. Allegedly, Mr. Broussard had also promised his sisters that he would distribute sufficient dividends to enable them to pay their pro-rata taxes, and after the demand to see the financial records and mandamus suit was filed, he refused to do so unless they dismissed their claims. Ms. Guillory had to borrow money to pay her pro rata share of the taxes.[1]

When Mr. Broussard continued to refuse to distribute dividends from SBT's profits and refused to account to SBT for misuse of its funds, Ms. Guillory and Ms. Lopresto filed the subject lawsuit. Ms. Lopresto withdrew from the litigation, but then amended the suit by consent of all parties to be added as a nominal indispensable party. Ms. Guillory proceeded to bring this case to trial as a shareholder's derivative action seeking to recover as direct result of the alleged breach of fiduciary duty, self-dealing, and corporate mismanagement by Mr. Broussard, the majority shareholder, director, and president. Among other allegations, the suit claimed that Mr. Broussard intentionally paid himself excessive compensation and deliberately withheld distributions of profit from the shareholders in order to coerce dismissal of Ms. Guillory's law suits. Ms. Guillory claimed that based on Mr. Broussard's actions, and especially based on his deliberately withholding profit distributions to coerce dismissal of Ms. Guillory's suits, Mr. Broussard committed a violation of the Louisiana Unfair Trade Practices Act (LUTPA) and was liable for damages and attorney's fees pursuant to La.R.S. 51:1402 *et seq.*

---

[1]Separate litigation was filed in connection with this claim along with other allegations, and an appeal of a jury verdict is pending in that case before a different panel of this court. CA-15-888 appeal from trial court No. 119923, Div. F.

This case eventually proceeded to bench trial on Ms. Guillory's claims, during which Mr. Broussard, under cross-examination in plaintiff's case in chief, admitted that he set his own compensation, admitted removing Ms. Guillory and Ms. Lopresto from the Board, and admitted he did not distribute dividends in spite of SBT's increased net profits. The financial records eventually disclosed the compensation noted above. The evidence also disclosed that while managing SBT, Mr. Broussard was running four additional companies and allegedly spending many of his afternoons at his horse ranch, using SBT funds to make improvements. During the time period from 2004-2011, Ms. Guillory claimed that she was not aware of the excessive compensation Mr. Broussard was paying himself as he never provided his sisters with financial statements that would show his compensation until after their mandamus suit was filed.

At the close of plaintiff's evidence, Mr. Broussard moved for involuntary dismissal pursuant to La.Code Civ.P. art 1672(B), which was granted by the trial court, and affirmed by this majority. The trial judge specifically, and improperly, placed the burden of proving excessive compensation by an alleged self-dealing managing director on the plaintiff, Ms. Guillory, when he held:

> Therefore, [I] find that the plaintiff has failed to prove that the compensation paid to Mr. Broussard is excessive. I'm not saying that -- it may be excessive, but the plaintiff failed to prove it and, therefore, I will grant the Motion for Involuntary dismissal regarding the excessiveness of the compensation[.]

That error of law then interdicted the fact-finding process. Ordinarily, we review a trial court's findings of fact using the manifest error standard of review. If the findings are reasonably based on all the evidence, we are not permitted to reverse those findings unless there is no factual support for the findings or unless clearly wrong. *Rosell v. ESCO,* 549 So.2d 840 (La. 1989).

However, when a legal error interdicts the fact finding process, we no longer use the manifest error standard of review and, after reviewing the complete record before us, we conduct a de novo review and make our own independent findings. *See Evans v. Lungrin*, 97-541 (La. 2/6/98), 708 So.2d 731.

It is clear from the trial court's reasons for ruling that he placed the burden of proof squarely on the plaintiff to prove all elements of its claims by a preponderance of the evidence. But in a shareholder's derivative action, the burden of proof shifts to an interested director or corporate officer once a prima facie case of self-dealing is established. *Donaldson v. Universal Eng'g of Maplewood, Inc.*, 606 So.2d 980 (La.App. 3 Cir. 1992); *Woolley v. CAS Ref. Inc.*, 94-648 (La.App. 2 Cir. 1/11/95), 651 So.2d 860, *writ denied*, 95-1158 (La. 6/16/95), 655 So.2d 331.

I would find that once Ms. Guillory proved that Mr. Broussard was the sole manager and decision maker of SBT and had set his own salary and benefits, had removed his sisters from the Board, and had withheld dividends, none of which was contested, the burden then shifted to him to show that he was not being paid excessive compensation and that his actions were in good faith, arms length transactions and was inherently fair to the corporation and the minority shareholders.

In *Noe v. Roussel*, 310 So. 2d 806, 818 (La. 1975) (emphasis added.), the Louisiana Supreme Court discussed the following relevant criteria from the United States Supreme Court case of *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939):

> 'A director is a fiduciary. . . . Their dealings with the corporation are subjected to strict scrutiny and where any of their contracts or engagements with the corporation is challenged <u>the</u>

burden is on the director not only to prove good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.

The Louisiana Supreme Court in *Noe* went on to hold that, "We hold, therefore, that an agent who . . . otherwise acts in a fiduciary capacity, bears the burden of establishing that the transaction was an arm's length affair." *Id*. at 818-19 (emphasis added).

In *Woodstock Enterprises, Inc. v. International Moorings & Marine, Inc.*, 524 So. 2d 1313, 1317 (La. App. 3 Cir. 1988), a panel of this court cited *Noe* in holding that, "An interested director bears the burden of proving his good faith in entering into a contract on behalf of his corporation as well as the inherent fairness of such contract from the standpoint of the corporation." (Emphasis added.) Further in *Donaldson*, 606 So.2d 980, 988-89 (La.App. 3 Cir. 1992) (emphasis added) (citations omitted) (citing *Dunbar v. Williams*, 554 So.2d 56 (La.App. 4th Cir. 1988), a panel of our court held:

> Louisiana law imposes upon corporate officers and directors a fiduciary duty to the corporation and its shareholders when an officer or director contracts with the corporation. The transaction is subject to close judicial scrutiny to ensure the no violation of fiduciary duty is involved.
>
> . . . .
>
> The person acting in the fiduciary capacity bears the burden of establishing that his transactions were legitimate. By law, the interested director must show not only that the action was fair to the corporation, but also that it was essentially an 'arm's length' transaction.

As in this case, the court in *Donaldson* noted, "A review of the lower court's written reasons for judgment reveals that the trial judge did indeed erroneously place the burden on the plaintiffs rather than the defendant." *Id.* at 988 (emphasis

added). *See also Hirsh v. Cahn Electric Co., Inc.*, 29,327 (La. App. 2 Cir. 5/9/97), 694 So.2d 636, *writ denied*, 97-1561 (La. 10/3/97), 701 So.2d 200.

I would note especially that pursuant to the law that was in effect at the time this case was filed, La.R.S. 12:91(A)[2] provided: "Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective position in good faith[.]" I would submit that as a matter of conscience as well as a matter of law, that duty is heightened when the only shareholders are one's own siblings.

The crux of the majority's holding is that Ms. Guillory failed to present a "prima facie case by merely filing a pleading alleging a breach of fiduciary duty to the corporation. For that reason, we do not find that Ms. Guillory's pleading alone is enough to shift the burden of proof to Mr. Broussard[.]" (Emphasis added.) In spite of this statement, the majority did go on to review the evidence plaintiff had submitted in support of its prima facie case. The error of law persisted because the majority looked at that evidence through the lens of the manifest error rule. Because I would find that the trial judge and majority failed to properly shift the burden of proof to Mr. Broussard, this legal error interdicted the fact finding process. Reviewing the evidence de novo, I would find that Ms. Guillory clearly and, I would submit, overwhelmingly presented a prima facie case, thus shifting the burden to Mr. Broussard.

The trial judge and majority failed to properly shift the burden of proof and credit the unrebutted testimony that Mr. Broussard fixed his own compensation and intentionally withheld dividends. Plaintiff proved bad faith and self-dealing by

---

[2]Louisiana Revised Statutes 12:91 was repealed by Acts 2014, No. 328, § 5, effective Jan. 1, 2015.

Mr. Broussard's own testimony under cross examination, by his e-mails, and by SBT's records filed in evidence. It was then Mr. Broussard's burden to prove that his compensation was not excessive and his management was not derelict. If Ms. Guillory had the final burden of proving excessive compensation in a shareholder's derivative action, then, basically, the burden would never be "shifted" at all, in direct contravention of the holdings in *Noe*, *Donaldson*, and *Woodstock*.

Assuming arguendo that the burden did not immediately shift once Ms. Guillory proved bad faith and self-dealing, on de novo review I would find that Ms. Guillory did put on considerable additional evidence to show excessive compensation and bad faith. Mr. Broussard admitted that when he submitted financial information to a prospective buyer for SBT, he used a yearly salary for a person holding his position of $250,000 per year, much less than the $1,000,000 per year plus additional benefits that he was paying himself.

Additionally, Mr. Ronald Gagnet, Ms. Guillory's expert C.P.A., testified that Mr. Broussard's annual compensation was greatly in excess of that which local companies pay executives similarly situated. He based his opinion on his many years of filing tax returns and providing financial advice to companies in this area. The trial judge found his method was not "reliable" because Mr. Gagnet had failed to offer evidence of what comparable trucking company executives were paid in this area. The main problem with this reasoning is that SBT is a closely held family corporation, not a public company. Just where was Mr. Gagnet to find hard comparisons of companies similarly situated, since none of their financial records, let alone executive compensation information, were public record? Mr. Gagnet testified, without revealing client confidentiality, that based on his many years of experience handling tax returns and financial planning for companies similarly

situated, Mr. Broussard's compensation was excessive. On de novo review, I would find that there is no reasonable basis in the record for the trial judge's decision to exclude his testimony as "unreliable," especially in light of the fact that the evidence was submitted in order to prove a prima facie case of excessive compensation. A *prima facie* case is defined as, "1. The establishment of a legally required rebuttable presumption. 2. A party's production of enough evidence to allow the fact finder to infer the fact at issue and rule in a party's favor."[3]

In reviewing the record de novo, I would find that the admissions of Mr. Broussard, as well as the e-mails, and corporate records introduced, clearly established a prima facie case that Mr. Broussard was receiving excessive compensation, was in bad faith and was self-dealing. A *fortiori,* Mr. Gagnet's testimony clearly established and buttressed a prima facie case that Mr. Broussard was being paid excessive compensation.

While the trial judge does have the authority to weigh evidence and assess credibility in a Motion for Involuntary Dismissal, he must do so based on the proper placement of the burden of proof. In this case the burden of proof had shifted to Mr. Broussard. Mr. Broussard had not testified on direct and no evidence had been offered as yet to sustain his burden of proving that his compensation was not excessive, that he did not misuse company funds, or that he did not improperly withhold dividends to coerce dismissal of Ms. Guillory's lawsuits. To the contrary, the corporate minutes and e-mails already in evidence clearly establish that Mr. Broussard voted his shares to remove his sisters from the Board, install his own children, and then voted their proxies to approve his actions.

---

[3]BLACK'S LAW DICTIONARY 9th ed. West 2009.

*See Noe*, 310 So. 2d 806; *Woodstock*, 524 So. 2d 1313; *Donaldson*, 606 So.2d 980; *Wooley*, 651 So.2d 860; and *Hirsh*, 694 So.2d 636.

I would submit that the trial judge committed legal error when he failed to shift the burden of proof to Mr. Broussard, and that his decision to dismiss the case on the basis of an involuntary dismissal was erroneous, as was the majority's ruling affirming the decision using the manifest error rule as its basis.

Louisiana Unfair Trade Practices Act
(LUTPA)

Mr. Broussard has also been sued under LUTPA for his refusal to distribute profits to shareholders in order to coerce dismissal of the shareholder law suits against him in violation of the La. R.S. 51:1405(A), *et seq*. The words of LUTPA prohibit "Unfair methods of compensation <u>and</u> unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" La.R.S. 51:1405(A) (emphasis added). Clearly, the words of the statute do not just prohibit unfair methods of competition, but also prohibit deceptive acts and practices. Nowhere in the statute can be found the requirement that these deceptive acts or practices "harm consumers." In fact, La.R.S. 51:1409(A) specifically gives the right of action to "any person." Louisiana Revised Statues 51:1402(8) defines "person" as "a natural person[.]" Further, in La.R.S. 51:1402(10), "'Trade' or 'commerce'" is also liberally defined in the statute as "distribution of any services and any property . . . or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of the state."

In *Cheramie Services, Inc. v. Shell Deep Water Prod., Inc.*, 09-1633 (La. 4/23/10), 35 So.3d 1053, a plurality opinion of the supreme court, the court held

that the court must look to "the words of the statute.[]" The plurality opinion went on the hold:

> The applicable theory of recovery before this court is provided in LUTPA. Louisiana Revised Statutes § 51:1405(A) prohibits any "unfair or deceptive act or practices in the conduct of any trade or commerce" and § 51:1509(A) grants a right of action to "[a]ny person who suffers any ascertainable loss" from a violation of this prohibition. It has been left to the courts to decide, on a case-by-case basis, what conduct falls within the statute's prohibition. *Dufau v. Creole Engineering, Inc.*, 465 So.2d 752, 758 (La.App. 5 Cir.), *writ denied*, 468 So.2d 1207 (La. 1985) (In order to recover under LUTPA a plaintiff must prove "some element of fraud, misrepresentation, deception, or other unethical conduct" on the part of the defendant.).

*Id*. at 1059.

I would find that the trial judge improperly granted an involuntary dismissal of the LUTPA claim. The trial judge specifically held, "although the evidence does indicate that Mr. Broussard intentionally did not distribute the profits . . . there was a valid business reason for not distributing them. Therefore he did not violate his fiduciary duty."

As the majority noted, the trial court then went on to conclude, I submit erroneously, that the definition of "trade and commerce" does not include the distribution or failure to distribute profits by a corporation to its shareholders. The majority affirms, finding no manifest error in the trial courts grant of the defendant's motion of involuntary dismissal of the LUTPA claim.

I respectfully disagree and I would find that a fair reading of the statute indicates there is no basis for the court's ruling that the definition of "trade and commerce" does not include the distribution or failure to distribute profits by a corporation to its shareholders under the circumstances of this case.

I would find on de novo review that at least a prima facie case was proven that Mr. Broussard was in bad faith when he unilaterally and without his sister's

knowledge or approval increased his executive compensation substantially between 2004 and 2011, as outlined infra, thus depriving them of the normal dividends from the company's net profits they should have received.

Mr. Broussard then convinced his sisters to "sell him" each fifteen (15%) percent of the company stock they all inherited from their father. He "bought" that stock using their own money as the company paid for the stock as "treasury shares". When Ms. Guillory would not withdraw her demand to see the company's financial records, Mr. Broussard "voted" his majority shares, removed his sisters from the Board, ceased paying director's fees, and ceased distributing dividends until after this suit was filed.

Moreover, when he had decided that it would be advantageous to have the company file returns as a sub-chapter S corporation, he had promised his sisters that he would distribute dividends to enable them to pay their pro-rata share of the company's taxes on its net profits. When they refused to dismiss their claims, he withheld the dividends, forcing Ms. Guillory to borrow money to pay her share of the taxes. He also ceased paying his sisters their pro rata share of the rent SBT was paying for use of the building and movables from which SBT was operating, claiming SBT owned the assets.

I would find on de novo review that all of these actions amount to unfair trade practices within the meaning of the law. At the very least, a prima facie case has been established.

Failure to recognize that plaintiff, Ms. Guillory, presented a prima facie case under LUTPA was an error of law that also interdicted the fact finding process. I would reverse on de novo review. *See Cheramie*, 35 So.3d 1053 and *Lungrin*, 708 So.2d 731. I would remand for a new trial on the LUTPA claim as well.[4]

New Trial

The remedy in this case is to order a new trial. I would respectfully find that the majority, erroneously in my view, held that since Ms. Guillory "intended to appeal only the final judgment on the merits, we need not address the motion for new trial issue." The record shows that Ms. Guillory did in fact appeal the trial court judgment denying the motion for new trial. Not only did Ms. Guillory appeal the motion for new trial, she also briefed the issue in the trial court. Her briefs and arguments on appeal mirror the arguments presented to the trial court in support of her motion for new trial.

Ms. Guillory did ask on appeal that we reverse and render judgment in her favor as opposed to ordering a new trial. She claims that Mr. Broussard did not specifically answer and plead an "affirmative defense" in the trial court that his compensation was "set in an arm's length transaction and fair to all concerned[,]" such that he should now be precluded from asserting that "affirmative defense."

I would find that Mr. Broussard is entitled to present a defense on the merits of the claim on remand. He answered, denying liability, and under a fair reading of the pleadings, as well as based on the evidence introduced on plaintiff's case in chief, he is entitled to introduce evidence that his compensation was lawfully approved by the Board, was set in an arm's length transaction, is fair to the

---

[4]See related litigation referenced in footnote one.

corporation and its minority shareholders, and that his actions in withholding dividends were in SBT's best interest and justified.

Since I would find the trial judge was legally in error by failing to properly shift the burden of proof, a new trial should be ordered for the parties on all issues in the interest of justice, to be held in accordance with the procedure outlined in La.Code Civ.P. art. 1978.

Disposition

I would reverse the decision of the trial court granting the motion for involuntary dismissal of Samuel Broussard, Jr., Michelle Cart, Curt Van Brocklin, as Trustee of the SSB 2012 Family Trust No. 1, and Sam Broussard Trucking Company and remand for a new trial on all issues to be held in accordance with the provisions of La.Code Civ.P. art. 1978. I would assess all costs of this appeal to Samuel Broussard, Jr.